IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


RUSSELL SODAN                                                    PLAINTIFF


v.                            NO. 3:19-cv-00243 PSH


ANDREW SAUL, Commissioner of                           DEFENDANT
the Social Security Administration


## MEMORANDUM OPINION AND ORDER


In this case, plaintiff Russell Sodan ("Sodan") maintains that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Sodan so maintains for two reasons: 1) the evaluation of his subjective complaints was inadequate, and 2) his residual functional capacity was erroneously assessed because the record contains no assessment from a treating or examining physician and the record does not support the finding that he can perform light work.

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id.

Sodan was born on August 25, 1980, and was thirty-five years old on April 21, 2016, i.e., the day he allegedly became disabled. In his application for disability insurance benefits, he alleged that he is disabled as a result of a lower back bulging disc, right foot drop, and nerve damage. The Commissioner of the Social Security Administration ("Commissioner") represents, and the Court agrees, that the relevant period here is from April 21, 2016, through January 7, 2019, i.e., the date of his final decision.

Sodan ably summarized the evidence in the record, and the Commissioner did not challenge the summary. It will not be reproduced in full, except to note matters germane to the issues raised by the parties.

The record reflects that on two occasions in February of 2016, Sodan sought medical attention for pain in his right hip that radiated into his right leg. See Transcript at 287-289, 284-287. Although he appeared to ambulate normally, he reported pain when walking, particularly upon getting out of bed in the morning. Sherry McCrary ("McCrary"), a nurse practitioner, diagnosed right side lumbago with sciatica and right hip pain. She recommended Medrol, Norco, and ibuprofen for his pain. An MRI of his lumbar spine was performed on March 4, 2016, and the results revealed disc herniation at L4-L5 and a smaller herniated nucleus pulposus at L5-S1. See Transcript at 342-343.

Sodan subsequently saw McCrary for shoulder, back, and leg pain on what appears to have been at least six occasions beginning in March of 2016. See Transcript at 282-284, 280-282, 277-279, 274-277, 272-274, 357-360. At the presentations, Sodan reported, inter alia, pain, numbness, and tingling in his extremities; difficulties sleeping because of pain; and a limited range of motion in his back and feet. McCray's diagnoses included polyneuropathy, chronic low back pain, lumbar nerve root compression, and lumbago with sciatica. She recommended medication that included gabapentin and Norco and referred him to a neurosurgeon.

On April 7, 2016, Sodan saw Dr. Khaled Krisht, M.D., ("Krisht"), a neurology specialist, for back pain and right lower extremity pain. See Transcript at 240-242. Krisht compiled a medical and social history and noted the following:

> … [Sodan] has trialed oral steroids to no avail. Lying down and sleeping worsens the pain and standing up for long periods of time also accentuates the pain. Extending helps with [the] pain. He has not trialed any injections and/or physical therapy. His MRI of the lumbar spine demonstrates evidence of an extruded L4-5 disk on the right with compression of the traversing L5 nerve root. …
>
> …
>
> He is currently unemployed. He was working as [a] forklift operator, however got laid off. …

See Transcript at 240. Sodan had normal muscle strength in all of his extremities and a normal gait. Krisht found evidence of "an L4-5 extruded disk eccentric to the right with compression of the traversing right L5 nerve root." See Transcript at 241. To treat Sodan's pain, Krisht recommended either injections or surgery. Sodan chose the latter option, in part, because it would hopefully allow him a quicker return to work. Approximately three weeks later, Krisht performed a minimally invasive, right L4-L5 microdiscectomy. See Transcript at 243-246.

Sodan saw Krisht on May 26, 2016, for a follow-up examination. See Transcript at 238. Krisht's notes include the following observations:

> … [Sodan] has done reasonably well. He has had 20% improvement in his Oswestry disability index from 38% to 18%. He has very little pain that is much less frequent in his right lower extremity and the intensity is also much less. He has improving numbness in his right lower extremity. All in all he is doing much better. He feels that [his] functional capacity has improved.

See Transcript at 238. Sodan was cautioned to avoid heaving lifting and overexerting himself, but he was believed to be capable of lifting up to twenty pounds. Krisht released Sodan to physical therapy.[2]

---

[2]    Between April 7, 2016, and April 29, 2016, Sodan saw a physician's assistant in Krisht's office. See Transcript at 239. Although Sodan reported that he was not having constant pain, he did report some pain and numbness in his leg.

Sodan thereafter saw a physician's assistant in Krisht's office on two occasions. See Transcript at 237, 234. At the presentations, Sodan complained of pain and numbness in his back but reported some benefit from physical therapy. In a disability certificate completed the day of the second presentation, the physician's assistant noted that Sodan had been totally incapacitated from April 7, 2016, to August 22, 2016, but was capable of returning to work. See Transcript at 235. She advised, though, that he work eight-hour shifts for two weeks before increasing his work hours. Sodan's physical therapist also completed a report the same day and noted that although Sodan was still having numbness in his right lower extremity, he was feeling better overall and was much stronger. See Transcript at 236.

On September 2, 2016, a CT scan of Sodan's cervical spine was performed after he presented to an emergency room complaining of pain in his neck and numbness in his hand. See Transcript at 321-325. The results showed a mild disc protrusion at C5-C6, and he was prescribed medication. An MRI of his cervical spine was performed a week later, and the results showed [m]inimal degenerative changes at C4-5 and C6-7 towards the left." See Transcript at 318. There was no evidence of disc bulging, disc herniation, or narrowing of the central canal or neural foramina.

On October 13, 2016, Sodan presented to an emergency room complaining of symptoms associated with a right foot drop. See Transcript at 313-315. Although an examination was unremarkable, he was diagnosed with a right foot drop and referred to a social worker.

Between December of 2016, and March of 2017, Sodan underwent two MRIs of his lumbar spine and a nerve conduction study. See Transcript at 295-296, 293-294, 290-292. The results of the first MRI showed "[p]ostsurgical changes at L4-L5 on the right without significant residual central canal or neural foraminal narrowing," "[n]o abnormal enhancement," and "[m]ild posterior disc bulging at L5-S1 with mild bilateral neural foraminal narrowing." See Transcript at 296. The results of the second MRI showed "[p]ostoperative changes with anterior epidural granulation tissue without definite recurrent disc herniation" but was negative for arachnoiditis. See Transcript at 291. The results of the nerve conduction study were abnormal on the right side. No testing was performed on the left side.

In June of 2017, Sodan began seeing Dr. Sunil Gera, M.D., ("Gera"), a pain management specialist. See Transcript at 349-351. At that time, Sodan reported that his chief complaint was his neck and back pain. His history of present illness was recorded to be as follows:

> The pain is dull, sharp and aching in character, has begun to have headaches, constantly present, with numbness in the right leg and toes, as well as the bilateral arms and fingers, and noticing weakness in the right leg. Rotation of neck, bending head forward, head backward, head sideward, body forward, body backward, walking, and lifting heavy objects increase the intensity of the pain. Medicine and lying down gives it relief. **He has done physical therapy**, has seen a neurosurgeon, has been on narcotics and is contacting an attorney for disability. …

See Transcript at 349. [Emphasis in original]. Sodan was taking gabapentin and ibuprofen for his pain. Gera performed a physical examination and observed that Sodan had an antalgic gait with a right foot drop and was wearing a prosthesis device. Sodan's neck showed bilateral tenderness, and his range of motion was restricted on flexion and was moderately to severely restricted on rotation, extension, and lateral bending. He had a restricted range of motion in his back on flexion and moderately to severely restricted range of motion on extension. He also had "[m]arked tenderness bilaterally [from] C2-C3 downward …" See Transcript at 351. Gera diagnosed multiple impairments, including degenerative disc disease in the lumbar area, low back pain, hip pain, and cervicalgia. Gera prescribed Dilaudid and Baclofen until such time as Sodan began to "get[] better," see Transcript at 351, and recommended a medial nerve branch block for the right L3-S1 facet joints.

Sodan thereafter saw Gera on a number of occasions for treatment that included medial nerve branch blocks and radiofrequency neurotomy. See Transcript at 348, 347, 383, 382, 381, 380, 379, 411-412, 410, 409, 408, 406-407, 405, 404, 403, 401-402, 400, 425-426, 424, 423. The progress notes from the presentations reflect that the severity of Sodan's neck and back pain fluctuated. At times, he reported that he was doing "wonderful," see Transcript at 411 (October 31, 2017, presentation), or was doing "good, much better," see Transcript at 425 (June 6, 2018, presentation). At other times, though, he reported that his pain was "bad," see Transcript at 382 (August 28, 2017, presentation), or had come back and was between seven and eight on a ten-point pain scale, see Transcript at 401 (April 6, 2018, presentation).

During the period Sodan was seeing Gera, Sodan also saw Nicole George ("George"), a nurse practitioner, for low back pain. See Transcript at 395-398. Sodan reported that his back hurt constantly, and he had intense pain when doing any activity for thirty minutes. He was unable to drive due to neuropathy and foot drop. George performed a physical examination and observed that Sodan had a "slight foot drop on the right side but [was] still able to dorsiflex and plantarflex his ankle slightly." George assessed low back pain and noted the following plan:

8

I discussed with Mr. Sodan and his wife that I really have nothing to offer him. He has not responded to surgery or multiple blocks or radiofrequency ablation. He says he is not responding to pain management either, and his most significant complaint from him and his wife is that he cannot drive due to his foot drop, and therefore, he cannot work. They are fixated on getting him disability for being unable to drive a forklift any longer. I discussed with them that I have no surgical solution for them, and they would mostly benefit from returning to pain management and having his pain treated. There is no need to follow up with me.

See Transcript at 397.

Drs. Kristin Jarrard, M.D., ("Jarrard") and William Harrison, M.D., ("Harrison") reviewed Sodan's medical records on behalf of the state agency and offered an assessment of his residual functional capacity. See Transcript at 48-49, 63-65. Jarrard and Harrison agreed that Sodan was capable of performing light work.

Sodan completed a series of documents in connection with his application for disability insurance benefits. In the documents, he represented, inter alia, that he experiences pain after standing for thirty minutes, walking for fifteen minutes, and sitting for two hours. See Transcript at 172. He has difficulty attending to his personal care, cannot prepare his own meals, can perform few household chores, and has difficulty getting around. See Transcript at 176-178.

The record contains a summary of Sodan's work history. See Transcript at 136-152. The summary reflects that he had FICA earnings between 1998 and 2016.

Sodan testified during the administrative hearing. See Transcript at 26-37. He stopped working in April of 2016, had surgery, then attempted to return to work but had to stop working after about a week. He assists around the house by occasionally doing the dishes and folding clothes. Sodan takes daily medication in the form of ibuprofen, gabapentin, Tylenol 4, and Baclofen, and some of the medication makes him drowsy. A typical day mainly consists of watching movies, laying on the couch, trying to play the guitar, helping around the house, and talking on a phone. He has not driven an automobile since approximately November of 2016.

The ALJ assessed Sodan's residual functional capacity and found that he is capable of performing light work, except that he can only occasionally stoop, kneel, crouch, and crawl and should avoid operating foot controls with his right lower extremity. The ALJ found at step four of the sequential evaluation process that Sodan cannot return to his past relevant work. At step five, the ALJ found that a hypothetical individual with Sodan's limitations could work other jobs. Given those findings, the ALJ concluded that Sodan was not under a disability as defined by Social Security Act.

Sodan first maintains that the evaluation of his subjective complaints was inadequate. Sodan maintains that the ALJ's evaluation was cursory, speculative, and ignored Sodan's work history.

As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. <u>See</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by determining whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluating the intensity, persistence, and limiting effects of the pain or other symptoms. <u>See</u> Social Security Ruling 16-3p. In making the latter evaluation, the ALJ must consider all the evidence, including evidence of the following:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms …; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

<u>See</u> Social Security Ruling 16-3p.

In determining the consistency of Sodan's allegations, the ALJ recited factors in accord with Social Security Ruling 16-3p and <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984). The ALJ noted Sodan's allegations with respect to his symptoms and limitations, including his allegations that "[h]e can walk no more than a few steps before falling," "[h]e … uses a brace and boot for foot drop," and "[h]e is not capable of driving due to his right foot drop." See Transcript at 13-14. The ALJ found that although Sodan's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence in the record.

The ALJ's evaluation of Sodan's subjective complaints was not exhaustive and made no mention of his work history. The evaluation was nevertheless adequate and is supported by substantial evidence on the record as a whole. The Court so finds for the following reasons.

First, the ALJ could and did find that Sodan has medically determinable impairments that could reasonably be expected to produce pain. Specifically, the ALJ could and did find that Sodan's degenerative disc disease and right foot drop could reasonably be expected to produce pain and other symptoms.

Second, the ALJ adequately evaluated the evidence relevant to the intensity, persistence, and limiting effects of Sodan's impairments. The ALJ did so by evaluating the medical evidence. The ALJ noted the right L4-L5 microdiscectomy performed by Krisht in April of 2016, the results of subsequent testing, the results of the medial nerve branch blocks and radiofrequency neurotomy performed by Gera, the opinions of the state agency physicians, and the findings and observations of the medical professionals who examined Sodan. With respect to their findings and observations, it is noteworthy that a physician's assistant in Krisht's office opined that Sodan was capable of returning to work as of August 22, 2016, an opinion consistent with the physical therapist's observation that Sodan was feeling better overall and was much stronger at that time. Additionally, a fair reading of Gera's progress notes reflects that the severity of Sodan's pain and other symptoms fluctuated over time.

The ALJ gave scant attention to the non-medical evidence. Although a complete evaluation of that evidence would have been helpful, the lack of such an evaluation does not warrant a remand as the evidence is unremarkable.[3]

---

[3]    In fact, the ALJ need not explicitly discuss each Polaski v. Heckler factor. See Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005). It is sufficient if the ALJ acknowledges and considers the factors before discounting the subjective complaints. See Id.

Sodan's daily activities are limited to mainly watching movies, laying on the couch, trying to play the guitar, helping around the house, and talking on a phone. There appears to be no sound explanation for such a limitation of his daily activities, especially in light of the fact that it is debatable whether his back and foot impairments, while undoubtedly causing pain and other symptoms, are acute. The ALJ noted the complaints voiced by Sodan and his wife to George that Sodan "could no longer drive due to his foot drop," and as a result, "he considered himself disabled." See Transcript at 15. It was for the ALJ to determine the weight to be given Sodan's observation as to the consequence of his foot drop.

The ALJ briefly considered the location, duration, frequency, and intensity of Sodan's pain or other symptoms and considered factors that precipitate and aggravate the symptoms. See Transcript at 13-14. For instance, the ALJ noted Sodan's allegation that he can walk no more than a few steps before falling. It was for the ALJ to determine the weight accorded the evidence offered with respect to those factors.

The ALJ also briefly considered the type, dosage, effectiveness, and side effects of Sodan's medication, and the treatment he has received. See Transcript at 14-15. For instance, the ALJ noted that Sodan's medications cause fatigue, viral infections, decreased hemoglobin, sedation,

hypertension, and hemorrhage. The ALJ also noted that Sodan has undergone lumbar surgery, medial nerve branch blocks, and radiofrequency neurotomy. See Transcript at 14-15. Again, it was for the ALJ to determine the weight accorded the evidence offered with respect to those factors.

It is true that the ALJ made no mention of Sodan's work history, save noting that he had previously worked as a material handler, laborer, and telephone solicitor. See Transcript at 15. Although a claimant's work history is a factor to be considered in evaluating the consistency of his subjective complaints, Sodan's work history is unremarkable. His FICA earnings statement reflects that he worked steadily between 2000 and 2001 and again between 2013 and 2015, but the statement reflects that he worked sporadically between 2002 and 2012. It is not clear how a more extensive analysis of his work history would have led to a different assessment of his residual functional capacity.

The question for the ALJ was not whether Sodan has pain caused by his impairments but the extent to which they impact the most he can do. The ALJ incorporated limitations for the impairments into the assessment of Sodan's residual functional capacity but not to the extent he believes is warranted. The ALJ could find as he did, though, because substantial evidence on the record as a whole supports his evaluation of the evidence.

Sodan offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Sodan maintains that his residual functional capacity was erroneously assessed because the record contains no assessment from a treating or examining physician and the record does not support the finding that he can perform light work.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). There is no requirement, though, that the assessment be supported by a specific medical opinion. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016). In the absence of opinion evidence, the medical records of the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's assessment. See Id.

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for him to have made an informed decision. It is true that there is no opinion from a treating or examining physician addressing Sodan's ability to perform work-related activities.

Although such an opinion would have been helpful, one was not required. The ALJ could and did rely upon the medical records prepared by Sodan's most relevant treating physicians, i.e., Krisht and Gera, in crafting the assessment of Sodan's residual functional capacity. Their records indicate that the severity of Sodan's pain and other symptoms fluctuated over time and cause some limitations in his ability to perform work-related activities.

Sodan maintains that the ALJ accorded too much weight to the opinions of the state agency physicians. A fair reading of the ALJ's decision does not establish that he accorded their opinions too much weight. Although he found their opinions persuasive, there is nothing to suggest he gave them controlling or great weight. In short, the ALJ could and did rely, in part, upon the opinions in assessing Sodan's residual functional capacity.

The governing standard in this case allows for the possibility of drawing two inconsistent conclusion. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Sodan's residual functional capacity that limited him to a reduced range of light work, and Sodan has not shown why the ALJ erred in doing so.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Sodan's

complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 3rd day of June, 2020.

_____
UNITED STATES MAGISTRATE JUDGE